**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TIMOTHY MURRAY, | ) |
| 3000 Washington Blvd. | ) |
| Arlington, VA 22201 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| US DEPARTMENT OF HOMELAND SECURITY | ) |
| IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) |
| 500 12th Street, NW | ) |
| Washington, DC 20536 | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT**

Plaintiff, Timothy Murray, by way of his attorney, Morris E. Fischer, Esq., hereby

states the following complaint, on information and belief formed after reasonable inquiry

under the circumstances, against Defendant:

**PARTIES**

1. Plaintiff, Timothy Murray, is an individual citizen and resident of Arlington County,

   Virginia.

2. Defendant, U.S. Department of Homeland Security, Immigration and Customs

   Enforcement, 500 12th Street NW, Washington, DC 20536.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to the Title VII of the Civil Rights

   Act, 42 U.S.C. § 2000e, which prohibits discrimination based on race, national origin,

   et al., and retaliation.

4. At all times relevant to this case, Defendant has been an "employer" as defined by 42 U.S.C. § 2000e(b).

5. Venue is vested in this Court, since the facts giving rise to this case took place in the District of Columbia.

## FACTS

**A. Plaintiff's background**

6. During the operative period, Plaintiff was employed with the Defendant as a Supervisory Special Agent, GS-1811-14 within Division 3 of the Homeland Security Investigations (HSI) unit.

7. The Plaintiff has been employed with ICE/DHS since July 2003.

8. During the operative period, the Plaintiff was a subordinate under Deputy Assistant Director (DAD) SES 1811 Waldemar Rodriguez's chain of command.

9. Plaintiff is a Caucasian of American national origin.

10. Plaintiff does not speak fluent Spanish.

11. Division 3 colleagues and supervisors have spoken in Spanish during business hours.

12. Division 3 colleagues and supervisors routinely speak in Spanish during business hours.

13. Division 3 colleagues and supervisors speak Spanish in the presence of employees who do not speak Spanish during business hours.

14. DAD Rodriguez speaks to certain Division 3 employees in Spanish.

15. DAD Rodriguez has made Spanish-speaking in Division 3 more prevalent.

16. DAD Rodriguez gives preferential treatment to Hispanic employees.

17. The use of Spanish in Division 3 has had a negative impact on work environment.

18. The use of Spanish in Division 3 creates distrust among employees.

**B. Management's favoritism of Hispanic employees in promotions and assignments**

19. In 2011, the Plaintiff applied for the position of Section Chief of IMAGE in Division 3.

20. The Plaintiff was fully qualified for said position.

21. DAD Rodriguez oversaw the section process for the IMAGE Section Chief position.

22. DAD Rodriguez did not select the Plaintiff for the position of IMAGE Section Chief.

23. Rodriguez selected Jose Linares for the IMAGE Section Chief position.

24. Jose Linares is Hispanic.

25. Linares has less work experience than the Plaintiff.

26. Linares is far less qualified than the Plaintiff for the position.

27. DAD Rodriguez selected Linares for the IMAGE Section Chief position because he is Hispanic.

28. In September 2012, the Plaintiff was to be granted a cash award.

29. The Plaintiff was to be granted an award for achieving a performance rating of 5 (achieved excellence).

30. The Plaintiff learned from Division 3 Unit Chief (GS-1811-15) Stephen Adaway that the Plaintiff had not been included in the awards processing paperwork.

31. The Plaintiff emailed and asked DAD Rodriguez for approval of the Plaintiff's performance award.

32. Despite specific requests from the Plaintiff, DAD Rodriguez refused to process the paperwork for a cash award for the Plaintiff.

33. DAD Rodriguez processed awards for Hispanic employees who received lower performance ratings than the Plaintiff.

34. The award denial was an act of discrimination against the Plaintiff.

35. The Plaintiff applied for the position of Special Assistant to the Deputy Assistant Director (SADAD).

36. On March 11, 2013, Division 3 announced the selection of another employee other than the Plaintiff for the SADAD position.

37. The Plaintiff was fully qualified for the SADAD position.

38. The Plaintiff had previously served as the Acting SADAD for almost a year.

39. The Plaintiff had been recommended for the position by National Gang Unit Chief Debra Parker and UC Adaway.

40. DAD Rodriguez oversaw the selection process for the SADAD position.

41. DAD Rodriguez selected Gilberto Figueroa-Rios for the SADAD position.

42. Gilberto Figueroa-Rios is Hispanic.

43. Figueroa-Rios is far less qualified than the Plaintiff for the position.

44. DAD Rodriguez selected Figueroa-Rios for the SADAD position because he is Hispanic.

45. On April 2, 2013, UC Parker informed the Plaintiff that DAD Rodriguez's favoring of Hispanic employees played a role in the Plaintiff's nonselection.

46. On multiple occasions, DAD Rodriguez has failed to forward agency emails directly to the Plaintiff and others in Division 3.

47. Agency emails contain information concerning job position openings.

48. DAD Rodriguez's failure to forward agency emails to the Plaintiff is a deliberate action.

49. DAD Rodriguez did not forward agency emails to the Plaintiff and others in order to select which employees he wanted to apply for job opportunities.

**C. Management's other acts of discrimination against Plaintiff**

50. On November 30, 2011, the Plaintiff applied for a position in the ICE Taskings division.

51. The Plaintiff was fully qualified for said position.

52. The Plaintiff learned that DAD Rodriguez refused to submit his name for the detail.

53. DAD Rodriguez refused to submit the Plaintiff's name in an attempt to block the Plaintiff's selection.

54. Supervisory Criminal Investigator Greg Cichetti asked the Plaintiff to resubmit his name for the ICE Taskings position.

55. The Plaintiff was selected for a one year tour of duty to ICE Taskings over the objections of DAD Rodriguez.

56. In November 2012, the Plaintiff applied for the HSI 1811 Outbound rotation position.

57. The Plaintiff was fully qualified for said position.

58. The Plaintiff was not selected for said position.

59. In November  - December of 2012, the Plaintiff submitted a request to HSI officials to serve a six month detail to address morale and budget issues.

60. The Plaintiff has prior experience in managing budget and morale issues.

61. The Plaintiff is fully qualified for said position.

62. HSI officials turned down the Plaintiff's requests to serve said detail.

63. In the fall of 2012, the Plaintiff learned that DAD Rodriguez was requesting the Plaintiff's return to Division 3 ahead of the projected end date of the Plaintiff's detail.

64. On December 14, 2012, Chief of Staff Nick Annan informed the Plaintiff that DAD Rodriguez was continuously requesting the Plaintiff's return to the office well ahead of the end of his detail.

65. An email dated October 9, 2012 from Annan states "Waldemar Rodriguez wants [Timothy Murray] returned to D3 ASAP."

66. Annan informed the Plaintiff that it was highly unusual for DAD Rodriguez to be so persistent about getting somebody back early from a tour of duty that had a set time.

67. DAD Rodriguez wanted the Plaintiff to return to Division 3 in order to limit the experience the Plaintiff would gain in another division.

68. DAD Rodriguez wanted the Plaintiff returned to Division 3 early in order to hinder the Plaintiff's attempts to advance his career.

69. In November 2012, the Plaintiff met privately with DAD Rodriguez to discuss his career path.

70. The Plaintiff told DAD Rodriguez that he was interested in leaving Division 3 in order to be exposed to and learn more things.

71. DAD Rodriguez told the Plaintiff that he would not help him rotate out of Division 3 and that he would stop him if he tried.

72. DAD Rodriguez told the Plaintiff that since he was not the supervisor when the Plaintiff started his rotation in Division 3, the Plaintiff would have to start over with a "clean slate" under DAD Rodriguez's supervision.

73. The experience gained working in multiple divisions would be invaluable to the Plaintiff's career path.

74. Gaining experience in multiple divisions would make the Plaintiff a more competitive candidate for future job positions.

75. Being denied the opportunity to gain experience in multiple divisions is a hindrance to the Plaintiff's career advancement.

76. DAD Rodriguez denied the Plaintiff's rotation requests in order to hinder the Plaintiff's career progression.

77. Rodriguez's did not deny the Plaintiff's rotation requests because the Division was short-staffed.

78. Other Hispanic employees were given the opportunity to rotate out of Division 3, though the Plaintiff was not.

79. Rodriguez's denial of the Plaintiff's rotation requests was an act of discrimination against the Plaintiff based on his national origin.

80. From November to December of 2012, the Plaintiff's supervisors harassed him to sign his 2013 PWP.

81. The Plaintiff refused to sign the PWP because DAD Rodriguez failed to explain his reasoning for denying the Plaintiff's performance award.

82. The Plaintiff continued to receive harassing emails from Division 3 Section Chief Supervisor Angie Salazar and other supervisors concerning his 2013 PWP.

83. On January 14, 2013, the Plaintiff sent a memo to DAD Rodriguez requesting to attend the HSI OIA Visa Security Investigations Course.

84. This specific training was invaluable to Plaintiff's ability to perform certain kinds of security investigations.

85. This specific training was invaluable to Plaintiff's ability to perform certain kinds of advanced job functions.

86. This specific training was invaluable to Plaintiff's ability to perform certain kinds of advanced job duties.

87. This specific training was invaluable to the Plaintiff's career path.

88. This specific training would have been of no cost to the division.

89. The training on Visa Security Investigations was scheduled for March 3, 2013 to March 22, 2013.

90. On January 31, 2013, DAD Rodriguez denied the Plaintiff's request for training.

91. DAD Rodriguez's reasoning for the denial was that the unit was short-staffed.

92. The Plaintiff's request for annual leave was approved by UC Parker on February 14, 2013.

93. The Plaintiff's annual leave was scheduled for March 13, 2013 to March 31, 2013.

94. The Plaintiff's request for annual leave was approved because the unit was, in actuality, not short-staffed.

95. DAD Rodriguez did not deny the Plaintiff's training request because the unit was short-staffed.

96. DAD Rodriguez denied the Plaintiff's training request in order to deny the Plaintiff an opportunity to advance his career.

97. On January 16, 2013, the Plaintiff applied for the DHS Secretary's Briefing Staff detail.

98. The Plaintiff was fully qualified for the position.

99. The Plaintiff was not selected for the detail.

100.   John La Forte was selected for the DHS Secretary's Briefing staff detail.

101.   John La Forte was chosen despite being far less qualified than the Plaintiff.

102.   The Plaintiff was not selected for the position because senior management was aware of the Plaintiff's desire to rotate out of Division 3.

103.   On February 19, 2013, the Plaintiff applied for the HSI Taskings tour of duty.

104.   The Plaintiff was fully qualified for the position.

105.   The Plaintiff was not selected for said position.

106.   On March 5, 2013, the Plaintiff applied for an 18 month tour of duty for the Director's Protection Staff.

107.   The Plaintiff was fully qualified for the position.

108.   The Plaintiff was not selected for said position.

109.   The Plaintiff's nonselection is part of a concerted effort by DAD Rodriguez and senior leaders to keep Plaintiff from leaving Division 3.

110.   DAD Rodriguez tainted the Plaintiff's reputation in front of senior executives.

111.   DAD Rodriguez's actions have made it impossible for the Plaintiff to receive a temporary duty assignment or field rotation.

**D. Incidents following EEO contact**

112.   In April 2013, the Plaintiff informed UC Parker and Section Chief Jason Shatarsky of his intention of filing an EEO complaint against DAD Rodriguez.

113.   UC Parker informed DAD Rodriguez of the Plaintiff's intent of filing an EEO complaint.

114.    In April 2013, the Plaintiff filed a complaint against Rodriguez for giving preferential treatment to Hispanic employees.

115.    DAD Rodriguez was aware of the Plaintiff's EEO activity.

116.    On April 24, 2013, the Plaintiff contacted an EEO counselor.

117.    Aforementioned counseling did not result in resolution of issues.

118.    In August 2013, the Plaintiff applied for the position of OCDETF coordinator.

119.    The Plaintiff was fully qualified for the position.

120.    Assistant Director Leigh Winchell oversaw the selection process for the OCDETF coordinator position.

121.    The Plaintiff was not selected for the position of OCDETF coordinator.

122.    Winchell selected another candidate, Kathy Martell, for said position.

123.    Martell is far less qualified than the Plaintiff for the position.

124.    Senior leadership has made it clear to employees during town hall meetings that they do not like complaints being filed.

125.    At the time, Winchell was DAD Rodriguez's manager.

126.    Winchell's nonselection of the Plaintiff was an act of retaliation for the Plaintiff's April 2013 EEO complaint against DAD Rodriguez.

127.    In August 2013, the Plaintiff applied for the HSI Outbound rotation detail.

128.    The Plaintiff was fully qualified for said position.

129.     Winchell worked on the Rotation Review Board overseeing the selection of said position.

130.    The Plaintiff was not selected for the HSI 1811 Outbound rotation.

131.   The Plaintiff's non-selection was an act of retaliation by Winchell for the Plaintiff's April 2013 EEO Complaint against DAD Rodriguez.

132.   In February 2014, the Plaintiff applied for the HSI 1811 Outbound Rotation.

133.   The Plaintiff was fully qualified for said position.

134.   Winchell worked on the Rotation Review Board overseeing the selection of said position.

135.   Acting DAD James Harris attempted to block the Plaintiff's application by refusing to forward his name for concurrence on his Outbound Rotation Memo.

136.   DAD Harris held the Plaintiff's memo in order to make it difficult for the Plaintiff to secure concurrence for the position.

137.   The Plaintiff was not selected for the HSI 1811 Outbound Rotation.

138.   Winchell influenced DAD Harris to hold the Plaintiff's memo as part of his retaliation against the Plaintiff for his EEO activity.

139.   On April 29, 2014, the Plaintiff filed a formal complaint.

## COUNT I
## DISCRIMINATION BASED ON NATIONAL ORIGIN

140.   Plaintiff adopts and incorporates by reference all of the allegations set forth in the previous paragraphs as if the same were fully set forth herein.

141.   Plaintiff is Caucasian of American national origin.

142.   The aforesaid discriminatory treatment and adverse employment action by Defendant toward Plaintiff caused tangible harm to Plaintiff in that they affected the terms, conditions and privileges of his employment.

143.   Other similarly situated employees not of Plaintiff's national origin were not subject to the same discriminatory treatment.

144.   A causal connection exists between Defendant's actions toward Plaintiff and Plaintiff's national origin.

145.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e) *et seq.*

146.    Defendant's aforementioned conduct reflects directly on a discriminatory attitude toward Plaintiff.

147.    Defendant committed the above-mentioned acts willfully, intentionally, and with actual malice toward the Plaintiff.

148.    The Plaintiff's national origin was a motivating and determinative factor for Defendant's actions against Plaintiff.

149.    The Defendant's actions and conduct were subjectively viewed by the Plaintiff as abusive and unwelcome.

150.    Had it not been for Plaintiff's national origin, the Defendant would not have taken said actions.

151.    In addition to the above, Plaintiff also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, loss of self-esteem, and other damages.

## COUNT II
## RETALIATION

152.    Plaintiff hereby adopts all aforesaid paragraphs as if fully reproduced herein.

153.    Plaintiff was retaliated against by Defendant, in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e) et seq., when Defendant denied the Plaintiff job advancement opportunities.

154.    Defendant's denial of Plaintiff's applications and requests for job advancement opportunities were executed in retaliation for Plaintiff opposing unlawful employment practices in violation of 42 U.S.C. §2000e-3.

155.    Plaintiff engaged in protected activity by filing a formal EEO complaint.

156.    Defendant was aware of Plaintiff's protected activity.

157.    Defendant's denial of job opportunities for Plaintiff caused tangible harm to Plaintiff in that they affected the terms, conditions and privileges of his employment.

158.    Plaintiff's protected activity was the cause of Defendant's denial of Plaintiff's applications and requests for job advancement opportunities.

159.    Other similarly situated employees who did not participate in such complaints were not subject to the same conditions of employment as Plaintiff.

160.    A causal connection exists between Defendant's denial of Plaintiff's applications and requests for job advancement opportunities and Plaintiff's protected activity.

161.    Defendant's denial of Plaintiff's applications and requests for job advancement opportunities caused Plaintiff monetary damages.

162.    In addition to the above, Plaintiff also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, illnesses related to stress, and other damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff demands:

A.     In the first cause of action, judgment against Defendant in the amount of

$1,000,000.00.

B.     All other relief that the Court deems appropriate.


                                        Respectfully Submitted,

                                        _____/s/_____
                                        Morris E. Fischer, Esq.
                                        1400 Spring Street
                                        Suite 350
                                        Silver Spring, MD 20910
                                        (301) 328-7631 phone
                                        (301) 328-7638 fax
                                        Attorney for Plaintiff

## **JURY DEMAND**

Plaintiff herein demands a jury for all issues to be tried in this case.


Respectfully Submitted,

__/s/_____
Morris E. Fischer, Esq.
1400 Spring Street
Suite 350
Silver Spring, MD 20910
(301) 328-7631 phone
(301) 328-7638 fax
Attorney for Plaintiff